**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**LISA TROUT,**

**Plaintiff,**

**v.**

**UNIVERSITY OF CINCINNATI MEDICAL CENTER, LLC,**

**Defendant.**

**Case No. 1:22-cv-36**

**JUDGE DOUGLAS R. COLE**

# OPINION AND ORDER

Plaintiff Lisa Trout claims that Defendant, University of Cincinnati Medical Center, LLC (UCMC), violated the Family and Medical Leave Act (FMLA) when it terminated her employment. But UCMC insists it terminated Trout for a legitimate reason. It says that Trout violated UCMC's Health Insurance Portability and Accountability Act (HIPAA) policy when she searched her husband's name in UCMC's electronic records system without a proper business purpose. UCMC now moves for summary judgment (Doc. 31). Because Trout cannot create a genuine dispute of material fact as to whether UCMC's proffered reason for Trout's termination was pretextual, the Court **GRANTS** UCMC's motion. And because only Trout's FMLA claim remains at this juncture, the Court **TERMINATES** this case.

## BACKGROUND[1]

UCMC hired Trout on March 9, 2020, as a part-time nurse clinician in its apheresis department.[2] (Trout Dep., Doc. 29-1, #366, 369, 371; Doc. 29-3, #475 (offer letter)). Like many other healthcare organizations, UCMC takes HIPAA compliance seriously. (McQueary Decl., Doc. 30-1, #745; Acker Decl., Doc. 30-2, #749; Doc. 29-1, #400). To that end, UCMC generally prohibits employees from using Epic, UCMC's electronic medical records storage system, (Doc. 30-1, #746; Doc. 30-2, #749), to access their own protected health information (PHI) or that of their family members or minor children. In fact, that information is restricted "in the same manner as access to other patients' PHI is restricted." (Doc. 29-11, #689). In other words, UCMC employees may access that information only for "treatment, payment[,] and healthcare operations." (*Id.*).

[1] The Court has already detailed the procedural history and the allegations in Trout's operative amended complaint in its August 1, 2024, Opinion and Order, which granted UCMC's motion to dismiss Trout's breach of contract claim with prejudice, but permitted her FMLA interference claim to proceed. (*See* Doc. 23). The Court will not rehash the procedural backdrop, but it does describe the summary-judgment record at length. In recounting the record, the Court relies on the parties' stipulated undisputed facts, submitted as part of their briefing as directed by Standing Order I.F.2, available at https://perma.cc/S2YS-S7ZP. (*See* Def.'s Statement of Proposed Undisputed Facts, Doc. 31-1; Pl.'s Resps. to Def.'s Proposed Undisputed Facts, Doc. 34-1). The Standing Order requires that each denial of a proposed undisputed fact "be supported with a citation to contrary evidence that would be admissible at trial." Standing Order I.F.2.b. Because Trout occasionally denies a proposed fact with no citation to record evidence, (*see, e.g.*, Doc. 34-1, #849 ¶ 42), the Court treats such "denials" as admitted facts. Similarly, Trout sometimes "denies" a proposed fact, and then offers an argument about a *related* fact, or provides additional context for the proposed fact. (*Compare, e.g.*, Doc. 31-1, #765–66 ¶¶ 20, 22, *with* Doc. 34-1, #847, ¶¶ 20, 22). The Court treats these "denials" as admissions of the proposed fact, as well (although it takes heed of the additional context Trout provides where appropriate).

[2] Apheresis is a medical procedure in which a centrifuge separates the blood into its various component parts (e.g., platelets, red blood cells, etc.). Certain components are then removed, with the remaining blood returned to the patient's bloodstream. *See, e.g.*, Nat'l Cancer Inst., *Apheresis*, https://perma.cc/7CH8-632B.

Trout received HIPAA (as well as UCMC privacy policy) training during her time at UCMC.[3] (Doc. 29-1, #381–91; Doc. 29-6 (training module spreadsheet); Doc. 29-7 (UCMC new hire IT security course); Doc. 29-8 (privacy compliance course); Doc. 29-9 (2020 compliance training course); Doc. 29-10 (certificate of completion)). Trout also signed UCMC's confidentiality and data security agreement, where she agreed "to access only those specific elements of information for which [she] ha[d] been authorized by virtue of [her] password(s) and for which [she] ha[d] job responsibility reasons to access." (Doc. 29-7, #485; Doc. 29-9, #633; Doc. 29-1, #383–84; *see* Doc. 31-1, #764 ¶ 7; Doc. 34-1, #846 ¶ 7). So Trout was aware during her time at UCMC that she could not use Epic for nonbusiness purposes. (Doc. 29-1, #392–93).

But according to UCMC, Trout's failure to adhere to that understanding led to a HIPAA investigation, and eventually, Trout's termination. As it turns out, Epic "tracks every keystroke and every page employees access through their individual password." (Doc. 30-1, #746). UCMC also bars employees from sharing their individual passwords and requires employees to log out before leaving a computer unattended. (*Id.*). To monitor HIPAA compliance, UCMC's compliance team conducts routine audits of employees' Epic activity to probe for unauthorized access. (*Id.*). For example, the compliance team sometimes conducts so-called "'same address' searches, meaning the audit looks for employees who access medical records of patients who

---

[3] Trout testified that she did not remember receiving a second round of HIPAA training in October 2020. (*See* Doc. 29-1, #387; *contrast* Doc. 31-1, #763 ¶ 5, *with* Doc. 34-1, #846 ¶ 5). Nonetheless, she concedes that she received "some" training." (Doc. 34-1, #846 ¶ 5). Still, Trout concedes that she was aware that it violated UCMC policy to run a patient search in Epic without a legitimate business reason. (Doc. 29-1, #393; *compare* Doc. 31-1, #764 ¶ 9, *with* Doc. 34-1, #847 ¶ 9).

live at the same address as the employee." (*Id.*). And on February 15, 2021, Trout's immediate supervisor, Jennifer McQueary,[4] learned that one of UCMC's "same address" audits "flagged Trout as having improperly accessed her husband's medical records and information on January 5, 2021." (*Id.*).

McQueary consulted with Human Resources and her manager, Kelly Acker, who directed McQueary to question Trout to determine whether she had any "business reason" for accessing her husband's PHI. (*Id.*). So, at a February 19, 2021, meeting, McQueary questioned Trout about the incident. (*Id.*; Doc. 29-1, #398–401). At that meeting (or shortly thereafter), Trout produced a written statement on a UCMC HIPAA investigation form. (Doc. 29-1, #397–99; Doc 29-13 (Trout statement)). In full, the statement reads:

> I don[']t remember looking up my husband[']s name in Epic. The only thing I can think that I may have done was search his name and then remembered that I am not authorized to view his information in Epic and clicked out of the name look up.
>
> I do know that I have never accessed his chart through Epic.
>
> I do have all of his info in my MyChart that he and I both have full access to.

(Doc. 29-13, #694). Both Trout and McQueary signed the statement once Trout completed it. (*Id.*).

Based on the audit, Trout's oral responses to McQueary's questions, Trout's written statement, and McQueary's "own knowledge that [Trout's] husband had not been a patient of our department," McQueary concluded that Trout had accessed her

[4] Some documents in the record contain McQueary's former name, "Jennifer Garlasco." (Doc. 33, #782). The Court uses McQueary's current name.

husband's PHI without a legitimate business reason in violation of UCMC policy. (Doc. 30-1, #747). And while neither McQueary nor Acker wanted to terminate Trout based on the incident, UCMC's Human Resources department, who had the final say-so on the matter, determined that "UCMC policy and practice" required that result. (*Id.*; Doc. 30-2, #751). So, on March 2, 2021, McQueary, Acker, and Jody Chalk, a Human Resources representative, met with Trout and "terminated [her] for a HIPAA violation." (Doc. 29-1, #404; *see* Doc. 29-14, #695 (corrective action notice)).

But Trout says that the HIPAA violation was a pretext for UCMC's true motive: terminating Trout before she could become eligible for FMLA leave. In early 2021, Trout's husband was experiencing some difficulties with his neck. As a result, the Trouts were considering surgery as one care option among others.[5] (*See* Doc. 29-1, #396, 406). According to Trout, she broached the subject of FMLA leave for her husband's potential surgery with McQueary at some point in February 2021, but *before* UCMC informed management of Trout's alleged HIPAA violation on February 15. (*Id.* at #404–06, 409; Resp., Doc. 34, #837–38). By Trout's telling, McQueary (who does not recall the discussion, (McQueary Dep., Doc. 33, #779)), told Trout that she was not yet eligible for FMLA leave but that she would be after her upcoming one-year anniversary at UCMC, (Doc. 29-1, #404–06). Trout contends that the timing of the February 15 notification, which occurred only days after Trout's FMLA inquiry with McQueary, raises an inference of interference or retaliation. (Doc. 34, #838, 839–

[5] The surgery ultimately did not occur. (Doc. 29-1, #409).

42). And she argues that the date of her termination—which occurred "just one week before she would become FMLA-eligible"—supports the same inference. (*Id.*).

Trout has responded, (Doc. 34), and UCMC has replied, (Doc. 35). So the matter is ripe for review.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant meets its burden, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

This Court does not have the responsibility to sua sponte search the record for evidence creating a genuine issue of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). That burden instead falls upon the nonmoving party to "set

forth specific facts" or evidence in dispute. *Anderson*, 477 U.S. at 250 (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In sum, in light of all the facts as to which UCMC shows a lack of dispute, Trout must in turn present some remaining "sufficient disagreement" which would necessitate submitting the matter to a jury. *See Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). That said, in making that determination, the Court must view the evidence in the light most favorable to the nonmoving party—Trout. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

Before getting to the main event, the Court first registers some confusion as to the way UCMC characterizes Trout's remaining FMLA claim. In its briefing, UCMC treats Trout's FMLA claim as sounding in both interference and retaliation, (Doc. 31, #757–58; Doc. 35, #852)—a framing that Trout echoes back in her response, (Doc. 34, #839). But Trout's amended complaint pleads a claim for "unlawful interference with FMLA rights," not retaliation. (Doc. 15, #192 (capitalization modified)). That's how the Court understood the claim in its August 1, 2024, Opinion and Order. (*See* Doc.

23, #232, 234, 239–40). Derivatives of the word "retaliate" appear in that Opinion only by way of reference to Trout's separate worker's compensation retaliation claim, which has since been resolved through arbitration. But that worker's compensation claim is not included in Trout's amended complaint; nor does it otherwise bear on the instant matter at all. (*See id.* at #232, 234–35; Doc. 15, #192–95 (asserting claims for FMLA interference and breach of contract)). So why is UCMC characterizing the remaining FMLA claim as sounding in both interference and retaliation? As best the Court can tell, it stems from Trout's occasional use of "retaliate" and related words in her amended complaint. (*See* Doc. 15, #192, 195–96; Doc. 35, #852 ("It remains unclear whether Plaintiff's FMLA claim is one of interference or one of retaliation.")). But while she may use those words in passing, the actual claim she presses seems to be solely for interference, not retaliation. (Doc. 15, #192–93).

Ultimately, though, the Court need not plumb the depths of this issue. Regardless of whether Trout's claim sounds in interference or retaliation or both, it fails for a reason common to both understandings—Trout's inability to show that UCMC's proffered reason for her termination was pretextual.

Trout's case at summary judgment relies on circumstantial evidence, so the Court relies on the familiar *McDonnell Douglas* burden-shifting framework, which the Sixth Circuit applies "to both FMLA interference and retaliation claims." *Snyder v. U.S. Bank Nat'l Ass'n*, No. 22-3385, 2022 WL 17330172, at *2 (6th Cir. Nov. 29, 2022) (first citing *Donald v. Sybra*, 667 F.3d 757, 762–63 (6th Cir. 2012); and then citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). "Under that

framework, the plaintiff first has the burden to show a 'prima facie case of discrimination.'" *Id.* (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001)). If the plaintiff makes that showing, the burden then "shifts to the defendant to 'articulate a legitimate, nondiscriminatory reason' for the challenged conduct." *Id.* It then falls to the plaintiff to demonstrate that the proffered reason is pretext. *Id.*

To establish a prima facie case of FMLA interference, Trout must show that (1) "she was an eligible employee"; (2) "the defendant was an employer as defined under the FMLA"; (3) "the employee was entitled to leave under the FMLA"; (4) "the employee gave the employer notice of her intention to take leave"; and (5) "the employer denied the employee FMLA benefits to which she was entitled." *Sybra*, 667 F.3d at 761 (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). And to establish a prima facie case of FMLA retaliation, Trout must show that (1) "she was engaged in an activity protected by the FMLA"; (2) "the employer knew that she was exercising her rights under the FMLA"; (3) "after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her"; and (4) "there was a causal connection between the protected FMLA activity and the adverse employment action." *Id.*

The parties differ as to whether Trout succeeds in establishing a prima facie case as to either theory. (*Contrast* Doc. 31, #757–58, *and* Doc. 35, #853–57, *with* Doc. 34, #839–42). But the Court will "assume, without deciding, that [Trout] has made a prima facie case and proceed to the 'ultimate issue'"—whether UCMC's proffered

reason for Trout's termination is pretext. *Childers v. Casey Cnty. Sch. Dist. Bd. of Educ.*, No. 23-5713, 2024 WL 3623527, at *4 n.3 (6th Cir. Aug. 1, 2024) (quoting *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

In justifying the termination, UCMC unsurprisingly points to its investigation and conclusion that Trout committed a HIPAA violation by running a search for her husband's name in Epic. (Doc. 31, #759–60; Doc. 35, #857–61). So it falls to Trout to demonstrate that that reason is pretext. *Snyder*, 2022 WL 17330172, at *2. To do that, Trout "must produce enough evidence such that a jury could reasonably reject [UCMC's] explanation and infer [UCMC] intentionally discriminated against her." *Solis v. Ohio State Univ. Wexner Med. Ctr.*, No. 24-3230, 2024 WL 4579501, at *4 (6th Cir. Oct. 25, 2024) (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001)). Normally, a plaintiff does this by showing that the employer's asserted reason "(1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the employer's action." *Stokes v. Detroit Pub. Sch.*, 807 F. App'x 493, 500 (6th Cir. 2020) (quotation omitted). At bottom, though, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Jackson v. Genesee Cnty. Road Comm'n*, 999 F.3d 333, 351 (6th Cir. 2021) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

Trout offers three reasons to reject UCMC's proffered reason as pretextual. First, she asserts that the "[c]lose [t]emporal [p]roximity" between Trout's FMLA inquiry and the February 15 notification to McQueary could lead a "reasonable jury [to] infer UCMC invoked the audit flag only when it needed a reason to fire a soon-

to-be FMLA-eligible employee." (Doc. 34, #843). Second, Trout argues that UCMC's motion "relies heavily on McQueary's declaration, which contains the self-serving [testimony] that Trout confessed." (*Id.*). But according to Trout, that testimony is "flatly contradicted by Trout's sworn testimony that she 'did not search his name.'" (*Id.* (quoting Doc. 29-1, #398–99)). The upshot of that, according to Trout, is that deciding whether the reason had a "basis in fact" would require the Court to make a credibility determination, which is not appropriate on summary judgment. (*Id.* at #843). Finally, Trout argues that UCMC's termination policy for HIPAA violations is not "automatic," as UCMC represents. (*Id.*). In support, Trout points to the "Corrective Action Notice" form that served as Trout's termination letter. (*Id.*; *see* Doc. 29-14). Trout notes that the form "includes check boxes for lesser discipline," (Doc. 34, #843), such as "Verbal Reminder," "Written Reminder," and "Final Written Warning," in addition to "Termination," (Doc. 29-14, #695). Trout also points to McQueary and Acker's efforts to intercede on her behalf by seeking "an exception … for a 'good employee' with no prior issues." (Doc. 34, #843–44 (citation omitted)). According to Trout, those efforts, "prove[] the decision was discretionary and so disproportionate as to be questionable." (*Id.* at #844).

Consider each argument in turn. Trout gets off to something of a rough start by rightly conceding that temporal proximity alone does not pass muster at the pretext stage. (*Id.* at #842 (citing *Green v. Wal-Mart Stores, East, L.P.*, No. 3:11-cv-440, 2013 WL 3223629, at *8 (S.D. Ohio June 25, 2013))). So the question is whether

Trout identifies evidence aside from temporal proximity that, when considered in conjunction with the temporal proximity, pushes the needle over the line.

She doesn't. First, Trout is wrong to assert that McQueary's and Trout's respective testimony requires the Court to make a credibility determination in deciding whether to grant summary judgment. The Sixth Circuit adheres to the "honest belief rule," so the relevant question is "the employer's belief, and whether it is informed and nondiscriminatory." *Sybra*, 667 F.3d at 763; *see also Hamm v. Pullman SST, Inc.*, 167 F.4th 382, 394 (6th Cir. 2026) ("[A]n employer who fires an employee for fraud does not need to establish that the employee committed the fraud—just that it honestly believed the employee did so."). "So long as the defendant made a 'reasonably informed and considered decision' based on 'particularized facts,' then no reasonable juror could find that the reason given for firing the plaintiff was pretextual." *Toth v. Cardinal Health 414 LLC*, No. 1:17-cv-370, 2020 WL 1275095, at *7 (S.D. Ohio Mar. 17, 2020) (citation omitted). Given the record, UCMC easily clears the reasonable-reliance-on-particularized-facts hurdle here, the factual dispute about whether Trout actually violated HIPAA notwithstanding.

Consider *Sybra*. There, somewhat like here, the plaintiff, an erstwhile Arby's employee, brought FMLA interference and retaliation claims (among others) when she was terminated following an allegation of theft. 667 F.3d at 759. The plaintiff's manager became suspicious when he noticed certain "irregularities in how customers were charged." *Id.* While the receipts showed that orders were taken at a full-price total, the orders were changed to reflect "a discounted price." *Id.* After discovering

that the plaintiff's drawer was four or five dollars short, the manager began "to listen in on [the plaintiff's] orders over the next few days." *Id.* And "[a]fter comparing the orders [the plaintiff] took to the figures entered into [the plaintiff's] register, [the manager] suspected that [the plaintiff] improperly discounted the orders and pocketed the difference." *Id.* at 759–60. When confronted, the plaintiff "denied all allegations of theft, and refused to sign a written form acknowledging the theft" before she was terminated. *Id.* at 760.

The district court declined to analyze the plaintiff's prima facie case and opted to skip straight to the pretext analysis, and the Sixth Circuit followed suit. *Id.* at 761–63. But even with that "boon," the plaintiff "provided insufficient evidence to prove that [the defendant's] stated reasons, cash register and order irregularities, were pretextual." *Id.* at 762. In its analysis, the Sixth Circuit began, like the Court does here, by rejecting the plaintiff's bare-bones temporal-proximity argument. *Id.* at 763 (citing *Skrjanc*, 272 F.3d at 317). It then went on to reject the plaintiff's argument that a particular comment (the substance of which is not relevant here) had a "subtext of animus." *Id.* With that, all the plaintiff's remaining arguments were about the veracity of the theft allegation, which the plaintiff vociferously disputed. *Id.* But, citing the honest-belief rule, the court concluded that such arguments were "irrelevant" in light of the defendant's reasonable reliance on particularized facts. *Id.*

So too here. Yes, McQueary's testimony arguably characterizes Trout's written statement as an admission to the HIPAA violation. (Doc. 30-1, #746 ("Trout admitted in the written statement that she may have searched her husband's name.")). And

there is no question that Trout denies running the search. (Doc. 29-1, #399 ("I did not search his name.")). So their respective positions about whether the violation occurred are at loggerheads. But the Court need not resolve that factual dispute to conclude that Trout fails to show pretext. Remember, the question is merely whether the employer "reasonably relied on the particularized facts that were before it at the time the decision was made." *Sybra*, 667 F.3d at 763. Here, McQueary's conclusion that Trout committed a HIPAA violation was based on several different "particularized facts," including the audit, Trout's oral response to McQueary's questions, the written statement, and McQueary's own knowledge that Trout's husband was not a patient in Trout's department. (Doc. 30-1, #747). So Trout might well be correct that she did not, in fact, search her husband's name. But, like the defendant in *Sybra*, UCMC has come forth with sufficient evidence to show that it "reasonably relied on the particularized facts that were before it at the time the decision was made."[6] 667 F.3d at 763.

Finally, contrary to Trout's arguments, neither the extra check boxes on the corrective action form nor McQueary's and Acker's stated desire at the time to refrain from terminating Trout suggest that UCMC's policy was "discretionary." (Doc. 34, #844). That UCMC's "standard corrective action form" has boxes "for other misconduct where lesser discipline can result" does not, in any way, suggest that

[6] The term "honest belief" appears once in Trout's briefing. (Doc. 34, #843 ("If a jury disbelieves McQueary, UCMC's 'honest belief' defense fails.")). But she cites no cases and offers no argument on the issue aside from her erroneous assertion that deciding the pretext question here requires the Court to resolve a credibility dispute between Trout and McQueary. The Court disagrees for the reasons explained above.

UCMC's policy regarding HIPAA violations, the conduct UCMC found to be at issue here, was discretionary. (Doc. 35, #860). And while McQueary and Acker expressed sincere regrets about Trout's impending termination, both have testified that they did not possess decision-making authority, and that Trout's termination was mandatory in light of UCMC's conclusion regarding the HIPAA violation. (Doc. 30-1, #747; Doc. 30-2, #750–51 ("I even went up to the Chief Nursing Officer and was told no—it is a strict policy because of how important HIPAA compliance is and there are no exceptions and no discretion.")). Contrary to Trout's framing, McQueary's and Acker's failed efforts to spare Trout from termination do not suggest that UCMC's policy was discretionary; rather, if anything, those failed efforts provide further evidence that it was a mandatory policy that would not bend—even for the "good employee" that all agree Trout was. (Doc. 33, #785).

In sum, while Trout may or may not have run the improper search that led to her termination, she identifies no evidence to support her view that UCMC's reliance on the search as a ground for her termination was pretextual. In other words, she offers no evidence from which a jury could find that UCMC decision-makers in fact concluded that she did not violate HIPAA, but fired her nonetheless. So summary judgment for UCMC on Trout's remaining FMLA claim—whether for interference or retaliation—is warranted.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** UCMC's Motion for Summary Judgment. (Doc. 31). Consistent with that, the Court **DIRECTS** the Clerk to enter judgment for Defendant and to **TERMINATE** this matter on the Court's docket.

**SO ORDERED.**

July 29, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**